**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. _____**

**WELLES TONJES,**

      **Plaintiff,**

**v.**

**THE BOARD OF COUNTY COMMISSIONERS FOR PARK COUNTY, in its official
capacity;
THE PARK COUNTY SHERIFF'S OFFICE;
FRED WEGENER, in his individual capacity; and
MARK HANCOCK, in his individual capacity,**

      **Defendants.**

_____

**COMPLAINT AND JURY DEMAND**
_____

Plaintiff, Welles Tonjes, through his counsel, the law firm of Benezra & Culver,

P.C., for his Complaint and Jury Demand alleges the following:

## I.  INTRODUCTION

1.      Plaintiff Welles Tonjes is a law enforcement officer with more than four

decades of experience.  In February of 2016, while employed as a Sargent ("Sgt.") with

the Park County Sheriff's Office ("the Office"), Mr. Tonjes was demoted three levels and

constructively discharged in direct contravention of the Office's policies regarding

discipline and demotion.  Additionally, Sargent Tonjes was demoted and constructively

terminated in retaliation for exercising his First Amendment right to association arising

from opposition to the misconduct of Defendants Wegener and Hancock, which led to the death of a Park County Officer.  Arising from these facts, Plaintiff Tonjes's Complaint alleges claims for relief for Violation of Due Process Property Interest pursuant to 42 U.S.C. § 1983 ("§ 1983"),  Violation of the Freedom of Association pursuant to § 1983, Deprivation of a Due Process Liberty Interest pursuant to § 1983, Breach of Contract, Promissory Estoppel, Tortious Interference with Contract, and Defamation.

## II.  JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action pursuant to § 1983 and 28 U.S.C. § 1967.

3.      Venue is proper in this judicial district because all of the events that give rise to this Complaint occurred in Colorado.

4.      Plaintiff Tonjes has complied with the procedural prerequisites of this Complaint.  Specifically, he served timely notice of claim under the Colorado Governmental Immunity Act against Defendants Wegener and Hancock.

## III.  PARTIES

5.      Plaintiff Welles Tonjes is a resident of Park County, Colorado.

6.      Defendant the Board of County Commissioners ("BOCC") of Park County is a municipal entity which governs Park County.  Under Colorado law, when suing Park County, Plaintiff Tonjes must name the BOCC.

7.      Defendant the Park County Sheriff's Office is also a municipal entity under Colorado law.

8.      Defendant Sheriff Fred Wegener resides within the District of Colorado.

9.     Defendant Mark Hancock resides in Wyoming.

## IV.  FACTUAL ALLEGATIONS

10.     Plaintiff Welles Tonjes has worked as a law enforcement officer since June of 1972.  From that date until January of 2008, Mr. Tonjes served with distinction at the Denver Police Department.

11.     In November of 2009, Mr. Tonjes was hired by the Park County to work in the Park County Sheriff's Office.  He worked there until his constructive discharge on February 29, 2016, as a Detention Deputy, Patrol Deputy, Patrol Corporal, Patrol/Investigation Sargent, and most recently as a Patrol Senior Sargent.

12.     During his entire tenure with the Office, Mr. Tonjes served with distinction. In the two formal performance reviews he received from the Office, Sgt. Tonjes received overall ratings of "exceptional."  He received approximately 22 awards, including a number of Letters of Appreciation, Letters of Gratitude, and a Special Citation for Bravery.

13.     When Sgt. Tonjes began his employment with the Sheriff's Office, he received a copy of the Park County Sheriff's Office Policy and Procedures Manual ("the Manual").  From time to time, he received updates to that Manual.  During his employment, he periodically reviewed this Manual.

14.     In its Introduction, the Sheriff's Office Manual provides that "This Manual has been designed to provide the policies and procedures required for uniformity of service to our community and to provide adequate guidance to the personnel of the Sheriff's Office."   The Introduction further provides that "This document [the Manual] is

published by the authority vested in Sheriff Fred Wegener, the Sheriff of Park County,

by numerous Colorado state statutes and personnel, and the constitution of the State of

Colorado."

      15.     Sheriff's Office Policies Series 300-341 pertain to "Personnel."  Among

other things, that section describes the policies and procedures regarding the discipline,

demotion, and termination of Sheriff's Office employees.

      16.     Policy number 320 is entitled "Corrective and Disciplinary Action."  In

Section II of that Policy, the Sheriff's Office promised its employees that a "disciplinary

demotion" may be taken under the following circumstances:

> Reduced by one or more levels of rank.  Disciplinary demotion may be
> imposed when the accused employee willfully engages in misconduct or
> intentionally violates policy and procedure.  Disciplinary demotion will only
> be authorized by the Sheriff.

      17.     In Section III of Policy 320, the Manual informs employees that:

> It is the policy of the Sheriff's Office to teach and correct the inappropriate
> behavior of the members through fair and consistent, disciplinary
> sanctions without regard to race, creed, color, sex, age, or national origin.
> This will be accomplished by conforming to the established due process
> requirements.  Through a defined a formal process, the standards of the
> Sheriff's Office will be maintained.

      18.     In Section IV of Policy 320, the Manual promises Sheriff's Office

employees that it will follow a specific disciplinary process and informs them of the

permitted ranges of discipline for various infractions. The most serious offenses, Level I

and Level II offenses, can result in all manner of discipline up through and including

termination.  Lower level disciplinary actions, known as Level III violations, for things

such as "[courtesy] complaints of rudeness . . . ", do not provide for demotion or

termination as a potential penalty.  Instead, this section provides that "Level III Complaints may carry any of the following disciplinary actions, or any combination thereof: (A) letter of counseling (B) remedial training (C) Letter of Reprimand (D) probation."  The Manual specifically provides that discipline for a Level III violation cannot be appealed.

19.     Policy 320 of the Manual also provides for various due process guarantees, including the Office's promise to provide employees with pre-deprivation due process, including notice of its intent to discipline and an opportunity for the employee to respond to allegations against him or her, as well as post-deprivation process, including a detailed appeals process within the Sheriff's Office.

20.     In February of 2016, the Sheriff's Office assisted a mortgage bank serve a civil eviction notice on a Park County citizen named Martin Wirth.  When Mr. Wirth failed to vacate the premises, the Sheriff's Office began planning to assist the bank's lock-out company in gaining access to the property.

21.     The Park County Sheriff's Office decided that it would approach Mr. Wirth at his residence on February 24, 2016, regarding his eviction.

22.     Mr. Wirth was well known within the Park County Sheriff's Office.  He was known to be anti-government and anti-police.  He was known to be armed, dangerous, and violent.  On social media sites, Mr. Wirth posted anti-law enforcement rhetoric, including "abolish the police," "this is why I hate cops," and "it's time to treat them [cops] like assassins."

23.     At some point in time in early February, Undersheriff Monte Gore, met with Captain ("Capt.") Mark Hancock about Mr. Wirth.  During their meeting, Undersheriff Gore instructed Capt. Hancock that Mr. Wirth was dangerous and that he was afraid Mr. Wirth "wanted to commit suicide by cop."  Thus, he instructed Hancock that Park County Officers should under no circumstance attempt to enter the Wirth residence.

24.     Prior to February 24th, Sgt. Tonjes met separately with Sheriff Fred Wegener, Capt. Hancock, and others about Mr. Wirth.  During those meetings, Sgt. Tonjes emphasized that Mr. Wirth was highly volatile and potentially dangerous.  He told them that Sheriff's Department Officers should under no circumstance attempt to enter the Wirth home.

25.     Based on his discussions with Sheriff Wegener, Capt. Hancock, and others, as of February 24, 2016, Sgt. Tonjes had the understanding that four deputy officers had been assigned to speak with Mr. Wirth at his residence about the eviction notice.  Specifically,  It was his understanding that those four deputies had been tasked with knocking on the door.  They were instructed that if Mr. Wirth came to the door that they should tell him that the lock-out company was waiting to come move his furniture and take possession of the home.  However, if Mr. Wirth refused to come to the door or refused to leave his home, the Officers were to leave the premises.  If the deputies were not able to secure Mr. Wirth's exit from his property, the matter was to be turned back over to the mortgage bank's attorneys who could seek a remedy from the local court for failure to comply with the eviction notice.

26.     On the morning of February 24, 2016, Undersheriff Gore and Sgt. Tonjes learned that Sheriff Wegener and Capt. Hancock had chosen a different strategy.  Even though this was simply a civil eviction, the Sheriff and Hancock decided to bring several members of the SWAT team with them to the Wirth premises.  When they arrived, Mr. Wirth came onto his deck and told the Officers he would not be leaving his home.  He then went back inside.

27.     Instead of leaving the premises as originally planned, Sheriff Wegener and Capt. Hancock ordered the deputies to storm the home and forcibly enter the premises. A shoot-out ensued and Corporal Nate Carrigan and Mr. Wirth were shot and killed. Two other deputies suffered gunshot wounds but did not lose their lives.

28.     After this unfortunate event, Plaintiff Tonjes and Undersheriff Gore discussed the events at the Wirth residence.  Both stated that the deaths of Cpl. Carrigan and Mr. Wirth, and the serious injuries to the two other deputies, were caused by the inappropriate and reckless orders of Sheriff Wegener and Capt. Hancock.

29.     Defendants Hancock and Wegener knew or suspected that Sgt. Tonjes and Undersheriff Gore had expressed concern about their handling of the Wirth situation.

30.     On February 26, 2016, which was his day off, Undersheriff Gore went to the Sheriff's Office to attend a debrief regarding the Wirth situation.  Sheriff Wegener angrily excluded Undersheriff Gore from that meeting.  Undersheriff Gore informed Sgt. Tonjes of the Sheriff's hostile and inappropriate conduct

7

31.     Later that morning, Undersheriff Gore, and Sgt. Tonjes visited Capt. Hancock at his home.  February 26, 2016, was also Sgt. Tonjes' day off.  Neither were meeting with Mr. Hancock in their official capacities.  Both were visiting him as private citizens.

32.     While visiting Hancock, the Wirth situation was discussed.  Among other things, Undersheriff Gore told Hancock that he held Sheriff Wegener fully responsible and to blame for the unnecessary violence, death, and injuries at the Wirth eviction. In response, Capt. Hancock became angry, appeared to choke, and came up out of his chair aggressively.

33.     At the time they spoke with Defendant Hancock, Sgt. Tonjes and Undersheriff Gore did not know that Hancock had been involved in giving the order to enter the Wirth residence.  They later learned he had been involved.  Hancock was therefore angry at Tonjes and Gore for suggesting that the decision to forcibly enter the Wirth residence was a mistake.

34.     Soon thereafter, Capt. Hancock informed Sheriff Wegener of his meeting with Sgt. Tonjes and Undersheriff Gore and the statements Gore made regarding the Wirth situation.  At that time, Wegener and Hancock decided to discipline or even fire Plaintiff Tonjes and Undersheriff Gore because of their opinions regarding how the Wirth situation was handled.

35.     On February 29th, when he arrived at work, Sgt. Tonjes was approached by Sheriff Wegener.  Sheriff Wegener appeared angry at Sgt. Tonjes.  During the discussion that followed, Sheriff Wegener informed Sgt. Tonjes that he had decided to

demote him three levels from a Senior Sgt. to a Patrol Officer.  That demotion would have led to a significant reduction in pay.  Wegener then told Sgt. Tonjes that he expected him to report to work the next day as a Patrol Officer.

36.     In demoting Sgt. Tonjes three levels, Sheriff Wegener told Sgt. Tonjes that the decision was made because Sgt. Tonjes had supposedly "yelled" at Cpl. Carrigan and Master Deputy Edward Goodman. Before making his decision to demote Sgt. Tonjes, Wegener did not discuss these allegations with Sgt. Tonjes.  Had he done so, he would have learned that the allegations against Sgt. Tonjes are false.  Plaintiff Tonjes never once yelled at Corporal Carrigan.  While he spoke to Master Deputy Goodman in a stern fashion, on one occasion, his tone was perfectly appropriate given that he was issuing Goodman a reprimand for his own improper conduct.

37.     During their conversation, Sgt. Tonjes told Sheriff Wegener that the allegations were unfounded.  Sheriff Wegener ignored Sgt. Tonjes' rebuttal.

38.     As soon as he received notice of his three level demotion, Sgt. Tonjes assumed he was being set up to be fired.  Based on Defendants Wegener and Hancock's behavior after the Wirth incident, he believed that he was being scapegoated for the tragedy.

39.     In deciding to demote Sgt. Tonjes, Defendants Wegener and Hancock were not acting in the best interests of the Office or County.  Their decision was solely motivated by their desire to retaliate against Sgt. Tonjes because of his opinions and associations regarding the Wirth mishap.  By demoting Sgt. Tonjes, Defendants

Wegener and Hancock hoped to create the false impression that Sgt. Tonjes was responsible for the tragedy at the Wirth property.

40.     At the end of his meeting with Sgt. Tonjes, Defendant Wegener told Sgt. Tonjes that he wanted to meet with Monte Gore.  Given the circumstances, Sgt. Tonjes assumed that Undersheriff Gore was going to be fired or disciplined.  In his meeting with Undersheriff Gore, Sheriff Wegener placed Undersheriff Gore on disciplinary leave based on erroneous accusations.  He was later terminated.

41.     If valid, which it was not,  the alleged misconduct that formed the basis of Sgt. Tonjes' three-level demotion constituted a Level III violation under the Offices' Policy Manual.  Under the Office Manual, a three level demotion is not permissible discipline for such a violation.

42.     Before Defendant Wegener made the decision to demote Sgt. Tonjes three levels, he did not inform Sgt. Tonjes that he was considering any discipline against him, did not inform Sgt. Tonjes of any of the accusations that had been made against him, and did not give him an opportunity to respond.  Moreover, he did not follow the procedures regarding the investigation of complaints contained in Office Policies 318-320.  Moreover, after he was informed that he had been demoted three levels, Sgt. Tonjes was not afforded an opportunity to appeal the demotion decision to the Sheriff or the BOCC.  Under the Office Manual, an appeal to the Sheriff is the final level of appeal.

43.     After considering his three level demotion and the hostile and inappropriate conduct of Defendants Wegener and Hancock's conduct, Sgt. Tonjes

concluded that his working conditions had become intolerable and that it was no longer reasonable for him to continue working for the Sheriff's Office.  As such, on that day, he involuntarily resigned his employment.

44.     After Sgt. Tonjes was constructively discharged, Sheriff Wegener made false and stigmatizing comments about Sgt. Tonjes designed to scapegoat Sgt. Tonjes and deflect blame away from himself.  For example, on March 2, 2016, he told Brian Maass of Channel 4 News in Denver that he had made the decision to demote Sgt. Tonjes and that "it was related to the handling of how the deputies responded [at the Wirth scene]".  Based on his interview with Wegener, Maass reported that "a Park County Sheriff Sargent was in the process of being demoted and then resigned Monday over the tactics that lead to the Feb. 24 death of Cpl. Nate Carrigan."

45.     By policy, the Park County BOCC delegated final decision-making authority to Sheriff Wegener to discipline Sheriff's Office employees, including Sgt. Tonjes, and to make comments regarding the Office's official acts.  No policy of the County or the Sheriff's Department permitted Sgt. Tonjes to appeal to the BOCC his three level demotion or the defamatory statements made against him.  By Office policy, Sheriff Wegener had final decision-making authority over all personnel decisions pertaining to Office employees.  As such, the actions taken against Plaintiff Tonjes were taken pursuant to the custom, policy, and practice of the BOCC and the Sheriff's Office.

46.     As a result of the preceding, Sgt. Tonjes has suffered damages, including wage loss, loss of benefits, and emotional distress.

## IV.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Denial of Due Process Property Interest Pursuant to § 1983
### (Against All Defendants )

47.     Plaintiff hereby incorporates Paragraphs 1 through 46 as though fully alleged herein.

48.     Plaintiff Tonjes had a property interest in his position as Patrol Senior Sargent and in continuing employment with Park County Sheriff's Office by virtue of its personnel policies regarding demotions and discipline.

49.     Defendants deprived Plaintiff Tonjes of that property interest by demoting him three levels without cause as defined by the Office's Policies.

50.     Defendants violated Plaintiff Tonjes' due process rights because they failed to provide him with either pre-termination or post-termination process when they deprived him of a property interest.

51.     In demoting Plaintiff Tonjes three levels without affording him due process, the individually named Defendants violated clearly established law of which a reasonable government official would have known.

52.     Defendants' conduct was willful and wanton and taken with reckless disregard for Sgt. Tonjes' rights and feelings.

### SECOND CLAIM FOR RELIEF
### Violation of Freedom of Association Pursuant to § 1983
### (Against All Defendants)

53.     Plaintiff hereby incorporates Paragraphs 1 through 52 as though fully alleged herein.

54.     Plaintiff Tonjes exercised his First Amendment Freedom of Association by associating with former Undersheriff Gore regarding their joint belief that Defendants Wegener and Hancock had acted recklessly and inappropriately regarding the Wirth situation, which led to the death of two individuals and serious injuries against two others.

55.     In exercising his associational rights, Plaintiff Tonjes was not acting pursuant to his official duties.  It was not his job to question the conduct of the Sheriff. Moreover, the issues regarding the Wirth situation were raised outside the work context.

56.     Plaintiff Tonjes' associational activities touched on matters of public concern.

57.     The decision to demote Plaintiff Tonjes three levels was motivated by Plaintiff Tonjes' associational activities.

58.     In demoting Plaintiff Tonjes three levels because of his associational activity, the individually named Defendants violated clearly established law of which a reasonable government official would have known.

59.     Defendants' breach was willful and wanton.

.                          **THIRD CLAIM FOR RELIEF**
**Deprivation of Due Process Liberty Interest**
**(Against Defendants BOCC, Sheriff's Office, and Sheriff Wegener)**

60.     Plaintiff hereby incorporates Paragraphs 1 through 59 as though fully alleged herein.

61.     Plaintiff Tonjes had a liberty interest in his good name.

62.     Defendants deprived Sgt. Tonjes of his liberty interest in his good name by demoting him three levels based on fabricated cause and by making untrue and stigmatizing comments about him to the press regarding the reasons for that demotion.

63.     The defamatory statements made regarding Sgt. Tonjes were made in the context of his three level demotion and constructive discharge.

64.     When it deprived Plaintiff Tonjes of his liberty interest in his good name, Defendants did not provide him with the opportunity of a name clearing hearing or any other due process procedures.

65.     In demoting Plaintiff Tonjes three levels and defaming him without due process, the individually named Defendants violated clearly established law of which a reasonable government official would have known.

66.     Defendants' conduct was willful and wanton and taken with reckless disregard for Plaintiff Tonjes' rights and feelings.

**FOURTH CLAIM FOR RELIEF**
**Breach of Contract**
**(Against Defendants BOCC and Sheriff's Office)**

67.     Plaintiff hereby incorporates Paragraphs 1 through 66 as though fully alleged herein.

68.     The Park County Sheriff's Office Policy and Procedures Manual constitutes a contract between Defendants and Mr. Tonjes.  By that Manual, Plaintiff Tonjes was promised that he would not be disciplined or demoted except for serious cause.

69.     Plaintiff Tonjes accepted that contract by accepting and continuing his employment with Park County and the Sheriff's Office.

70.     Defendants breached Plaintiff Tonjes' contract by demoting him three levels and subjecting him to discipline without cause as defined by the Manual and without following the procedures described in the Manual for investigations, discipline, and demotion.

71.     Defendants' breach was willful and wanton.

### FIFTH CLAIM FOR RELIEF
### Promissory Estoppel
### (in the alternative)
### (Against Defendants BOCC and Sheriff's Office)

72.     Plaintiff hereby incorporates Paragraphs 1 through 71 as though fully alleged herein.

73.     Through the Park County Sheriff's Office Policy and Procedures Manual, Defendants made representations to Plaintiff Tonjes that he would not be disciplined or demoted except for serious cause.

74.     Defendants expected that Sheriff Office employees would rely on their representations regarding discipline, demotion, and due process.

75.     Plaintiff Tonjes reasonably relied on Defendants' representations by accepting and continuing his employment with Defendants.

76.     Defendants breached their promises to Plaintiff Tonjes by demoting him three levels and subjecting him to discipline without cause as defined by the Manual and without following the procedures described in the Manual for investigations, discipline, and demotion.

77.     Defendants' breach was willful and wanton.

## SIXTH CLAIM FOR RELIEF
## Intentional Interference with Contract
## (Against Defendants Wegener and Hancock)

78.     Plaintiff hereby incorporates Paragraphs 1 through 77 as though fully alleged herein.

79.     Plaintiff Tonjes had an employment contract.

80.     Defendants knew that Plaintiff Tonjes had such a contract and/or had knowledge of facts which reasonably should have caused them to know of the contract.

81.     Defendants, with this knowledge, intentionally and improperly induced the third Parties to breach the contract.

82.     Defendants' misconduct was willful and wanton.

## SEVENTH CLAIM FOR RELIEF
## Defamation
## (Against Defendant Wegener)

83.     Plaintiff hereby incorporates Paragraphs 1 through 82 as though fully alleged herein.

84.     Defendant Wegener made false and stigmatizing statements regarding Plaintiff Tonjes.

85.     As a result of Defendant's defamatory statements, Plaintiff Tonjes has suffered loss of reputation and ability to find re-employment.

86.     Defendant's defamatory statements were willful and wanton and taken in reckless disregard of his rights and feelings.

WHEREFORE, Plaintiff Welles Tonjes respectfully requests that this Court enter judgment in his behalf and against Defendants and award him the following:

(a)     injunctive, declaratory, and prospective relief as allowed by law;

(b)     damages in such amount as will be proven at trial for back-pay, and damages including lost benefits, wages, promotions, tenure, seniority and other employment opportunities;

(c)     an order to reinstate Plaintiff Tonjes, or, in the alternative, to pay front-pay and benefits in an appropriate amount;

(d)     compensatory damages, including for emotional distress, as allowed by law;

(e)     punitive and exemplary damages allowed by law on his § 1983 claims only;

(f)     attorney fees and costs as provided for by law; and

(g)     pre- and post-judgment interest, costs and expert witness fees, and such other relief as the Court deems just and proper.

**PLAINTIFF TONJES REQUESTS A TRIAL BY JURY
ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 24th day of February, 2017.

**s/  John A. Culver**
_____
**John A. Culver, Esq.**
**Seth J. Benezra, Esq**.
**Adam W. Ray, Esq.**
Benezra & Culver,P.C.
633 17th St., Suite 2610
Denver, CO  80202

Telephone: (303) 716-0254
FAX: (303) 716-0327
E-mail: sjbenezra@bc-law.com
Email: jaculver@bc-law.com
Email: awray@bc-law.com
Attorneys for Plaintiff Welles Tonjes