IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:17–cv–00487–KHR

WELLES TONJES,

       Plaintiff,

v.

THE PARK COUNTY SHERIFF'S OFFICE;
FRED WEGENER, in his individual capacity; and
MARK HANCOCK, in his individual capacity,

       Defendants.

---

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANTS' MOTION TO DISMISS

---

Magistrate Judge Kelly H. Rankin

     This matter comes before the court on the Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) (doc. #13) filed by Defendants Park County Sheriff's Office, Fred Wegener, and Mark Hancock on May 3, 2017.  Plaintiff Welles Tonjes filed his Response in Opposition to Defendants' Motion to Dismiss (doc. #27) on June 20, 2017, which was followed by Defendants' Reply in Support of Defendants' Motion to Dismiss (doc. #30) on July 7, 2017.  On July 12, 2017, Plaintiff Tonjes filed a Notice of Supplemental Authority in Support of his Response in Opposition to Defendants' Motion to Dismiss (doc. #31).

     The parties consented (doc. #17) to magistrate judge jurisdiction to "conduct all further proceedings in this civil action, including trial, and to order the entry of a final judgment," pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D.C.COLO.LCivR 72.2.  Accordingly, the case was referred on May 11, 2017.  Magistrate Judge Craig B. Shaffer heard oral argument

on the pending motion at a hearing on July 13, 2017. Judge Shaffer subsequently became

unavailable, and during his unavailability the case is referred to the undersigned. I have

carefully reviewed the parties' briefs and attached exhibits, the entire case file, the case law cited

by the parties, and the arguments advanced by counsel during the July 13 hearing. The court

also has conducted its own legal research. For the following reasons, Defendants' motion is

GRANTED IN PART and DENIED IN PART.

## PROCEDURAL BACKGROUND

On February 24, 2016, a member of the Park County Sheriff's Office was killed and two

of his colleagues were wounded while attempting to enforce a civil eviction notice entered

against Park County resident Martin Wirth. During this incident, Mr. Wirth also was shot and

killed. The lawsuit presently before the court arises from that unfortunate incident.

Plaintiff Tonjes commenced this action on February 24, 2017 by filing a Complaint

pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1367. The Complaint asserted claims against the

Board of County Commissioners for Park County, the Park County Sheriff's Office (hereinafter

the "Sheriff's Office"), Sheriff Fred Wegener, and former Captain Mark Hancock.[1] Plaintiff's

First Claim asserts Defendants deprived him of a constitutionally protected property interest on

February 29, 2016 by demoting him three levels without cause as required by the Sheriff's Office

Policy and Procedures Manual (hereinafter the "Manual"). The Second Claim alleges

Defendants violated Plaintiff Tonjes' First Amendment right to freedom of association by taking

adverse action against Mr. Tonjes based upon his association "with former Undersheriff [Monte]

---

[1] On June 19, 2017, Plaintiff Tonjes filed a Notice of Partial Dismissal (doc. #26) indicating that he was dismissing with prejudice, pursuant to Fed. R. Civ. P. 41(a)(1)(A)(I), all of his claims against Defendant Board of County Commissioners, as well as his claims for Intentional Interference with Contract (the Sixth Claim) and Defamation (the Seventh Claim) as to the remaining defendants. The court has dismissed those claims. Doc. #32 (July 13, 2017 minutes).

Gore regarding their joint belief that Defendants Wegener and Hancock had acted recklessly and inappropriately regarding the Wirth situation, which led to the death of two individuals and serious injuries against two others." *See* Complaint at ¶ 54. The Third Claim alleges under the Fourteenth Amendment that Defendants Sheriff's Office and Wegener deprived Plaintiff Tonjes of his constitutionally protected liberty interest in his good name. The Fourth and Fifth Claims assert, respectively, breach of contract and promissory estoppel on the part of Defendant Sheriff's Office.

To place the pending motion in a factual context, a brief summary of the allegations in the Complaint may be helpful. In November 2009, Plaintiff Tonjes joined the Park County Sheriff's Office after serving as a law enforcement officer for over 35 years.[2] Mr. Tonjes alleges that when he started with the Sheriff's Office he received a copy of the Manual, and thereafter received occasional written updates.[3] Over the course of seven years with the Sheriff's Office, Mr. Tonjes served as a Detention Deputy, Patrol Deputy, Patrol Corporal, Patrol/Investigation Sargent, and most recently as a Patrol Senior Sargent. During that same period, Plaintiff received positive performance reviews, as well as several Letters of Appreciation, Letters of Gratitude, and a Special Citation for Bravery.

In February of 2016, the Sheriff's Office was asked to assist in serving a civil eviction notice on Martin Wirth. The Complaint alleges that the Sheriff's Office knew that Mr. Wirth

---

[2] From June of 1972 until January of 2008, Mr. Tonjes served as a member of the Denver Police Department. Complaint at ¶ 10.

[3] The Complaint refers to specific portions or policies within the Manual. *See* Complaint at ¶¶ 14–19. Defendants marked as Exhibit A to their Motion those portions of the Manual (Articles 300 through 341) that set forth the policies and procedures relating to "Personnel" matters. *See* Doc. #13–1. Defendants also appended Article 201 regarding "Written Directives" to their Reply brief. *See* Doc. #30–1. Plaintiff Tonjes also provided the court with the Introduction and Personnel portions of the Manual with his Response brief. *See* Doc. #27–1.

was "anti-government and anti-police," as well as "armed, dangerous, and violent." Complaint at ¶ 22. For these reasons, Undersheriff Gore instructed Captain Hancock that "Park County Officers should under no circumstance attempt to enter the Wirth residence." *Id.* at ¶ 23. Prior to February 24, 2016, Plaintiff Tonjes expressed the same view in conversations with Sheriff Wegener, Captain Hancock and others. *Id.* at ¶ 24. Leading up to the incident on February 24, 2016, Plaintiff Tonjes had the understanding that the deputy officers participating in the eviction process would withdraw "if Mr. Wirth refused to come to the door or refused to leave his home." *Id.* at ¶ 25.

Undersheriff Gore and Sargent Tonjes learned on February 24 that Sheriff Wegener and Capt. Hancock had adopted a different strategy, choosing instead to involve several members of the SWAT team in the eviction enforcement effort. *Id.* at ¶ 26. When Mr. Wirth refused to leave his property, "Sheriff Wegener and Capt. Hancock ordered the deputies to storm the home and forcibly enter the premises." In the ensuing exchange of gun fire, "Corporal Nate Carrigan and Mr. Wirth were shot and killed," and "[t]wo other deputies suffered [nonfatal] gunshot wounds." *Id.* ¶ 27.

Following the fatal altercation at the Wirth residence, Plaintiff Tonjes and Undersheriff Gore expressed their belief that the incident, and the associated deaths and injuries, "were caused by the inappropriate and reckless orders of Sheriff Wegener and Capt. Hancock." *Id.* at ¶ 28. The Complaint further alleges that "Defendants Hancock and Wegener knew or suspected that Sgt. Tonjes and Undersheriff Gore had expressed concern about their handling of the Wirth situation." Complaint at ¶ 29. Undersheriff Gore told Plaintiff Tonjes on February 26, 2016, that Sheriff Wegener "angrily excluded [him] from" a meeting convened at the Sheriff's Office

to discuss the Wirth incident.  *Id.* at ¶ 30.  Later that same day, while they were off-duty,

Undersheriff Gore and Sergeant Tonjes went to Captain Hancock's residence to discuss the

Wirth incident.  The Complaint alleges that "[n]either were meeting with Mr. Hancock in their

official capacities," but instead "were visiting him as private citizens."  *Id.* at ¶ 31.  During the

ensuing conversation at the Hancock residence,

> Undersheriff Gore told Hancock that he held Sheriff Wegener fully
> responsible and to blame for the unnecessary violence, death, and
> injuries at the Wirth eviction.  In response, Capt. Hancock became
> angry, appeared to choke, and came up out of his chair
> aggressively.

*Id.* at ¶ 32.

The Complaint alleges that "[s]oon thereafter, Capt. Hancock informed Sheriff Wegener

of his meeting with Sgt. Tonjes and Undersheriff Gore," and that "Wegener and Hancock

decided to discipline or even fire Plaintiff Tonjes and Undersheriff Gore because of their

opinions regarding how the Wirth situation was handled."  *Id.* at ¶ 34.   When Plaintiff Tonjes

arrived for work on February 29th, Sheriff Wegener informed him that he was being demoted

three levels from a Senior Sargent, and that he should "report to work the next day as a Patrol

Officer."  That demotion would result in a significant reduction in pay.  *Id.* at ¶ 35.

In explaining his decision to demote Plaintiff Tonjes, Sheriff Wegener said that he was

responding to complaints that Plaintiff had supposedly "yelled" at two subordinates.  However,

the Complaint states that Sheriff Wegener had not previously informed Plaintiff of these

allegations.  Plaintiff Tonjes told Defendant Wegener that the allegations were unfounded.

Complaint at ¶¶ 36 and 37.  Prior to telling Plaintiff that he was being demoted, Defendant

Wegener "did not inform Sgt. Tonjes that he was considering any discipline against him, did not

inform Sgt. Tonjes of any of the accusations that had been made against him, [ ] did not give him an opportunity to respond," and "did not follow the procedures regarding the investigation of complaints contained in Office Policies 318-320." *Id.* at ¶ 42. Believing that the Sheriff's action had made his working conditions intolerable, Plaintiff Tonjes "involuntarily resigned his employment" on February 29, 2016. *Id.* at ¶ 43.

The Complaint also alleges that:

> In deciding to demote Sgt. Tonjes, Defendants Wegener and Hancock were not acting in the best interests of the Office or County. Their decision was solely motivated by their desire to retaliate against Sgt. Tonjes because of his opinions and associations regarding the Wirth mishap. By demoting Sgt. Tonjes, Defendants Wegner and Hancock hoped to create the false impression that Sgt. Tonjes was responsible for the tragedy at the Wirth property.

*Id.* at ¶ 39.

On March 2, 2016, Sheriff Wegener allegedly spoke with a reporter from a Denver television station, and during that conversation stated that his decision to demote Sergeant Tonjes "related to the handling of how the deputies responded [at the Wirth scene.]." In the wake of that conversation, a television story reported that "a Park County Sheriff Sargent was in the process of being demoted and then resigned ... over the tactics that lead [sic] to the Feb. 24 death of Cpl. Nate Carrigan." *Id.* at ¶ 44.

Defendants "deny the vast majority of the allegations, statements and conclusions set forth in the Complaint," and argue that Mr. Tonjes "has failed to state a cognizable claim for relief." Defendants Wegener and Hancock also insist that they "are clothed with qualified immunity" as to Plaintiff's alleged constitutional claims. *See* Scheduling Order (doc. #21), at 7; motion (doc. #13) at 12.

## ANALYSIS

Rule 12(b)(6) states that a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." *See* Fed. R. Civ. P. 12(b)(6). In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). However, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

To withstand a motion to dismiss, a complaint must contain enough allegations of fact "to state a claim to relief that is plausible on its face." *Id.* As the Tenth Circuit explained in *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007), "the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." "The burden is on the plaintiff to frame 'a complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atlantic*, 550 U.S. at 556). A complaint must set forth sufficient facts to elevate a claim above the level of mere speculation. *Id.* "Nevertheless, the standard remains a liberal one, and 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of these facts is improbable and that a recovery is very remote and unlikely.'" *Jordan v. Cooley*, No. 13–cv–01650–REB–MJW, 2014 WL 923279, at *1 (D. Colo. Mar. 10, 2014) (quoting *Dias v. City*

& *Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009)). *See also Sanchez v. Hartley,* 810 F.3d 750, 756 (10th Cir. 2016) (quoting *Bell Atlantic,* 550 U.S. at 556).

Generally, a court considers only the contents of the complaint when ruling on a Rule 12(b)(6) motion. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). Exceptions to this general rule include: documents incorporated by reference in the complaint; documents referred to in and central to the complaint, when no party disputes their authenticity; and "matters of which a court may take judicial notice." *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). *Cf. Gilbert v. Bank of Am. Corp.*, No. 11–cv–00272–BLW, 2012 WL 4470897, at *2 (D. Idaho Sept. 26, 2012) (noting that a court may take judicial notice "of the records of state agencies and other undisputed matters of public record" without transforming a motion to dismiss into a motion for summary judgment). If a plaintiff does not incorporate by reference or attach a document to its complaint, a defendant may submit an indisputably authentic copy which the court may consider in ruling on a motion to dismiss. *GFF Corp. v. Ass'd Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997). *See also Rooker v. Ouray Cty.,* 841 F. Supp. 2d 1212, 1216 (D. Colo. 2012), *aff'd,* 504 F. App'x 734 (10th Cir. 2012) (considering employee manual attached to Rule 12(b)(6) motions, whose authenticity was not disputed).

A.  *Plaintiff's Due Process Property Interest, Breach of Contract and Promissory Estoppel Claims*

In moving to dismiss, Defendants argue that Plaintiff's first claim must fail as Mr. Tonjes did not have a due process property interest either in his continued employment with the Park

County Sheriff's Office or his rank as a Patrol Senior Sergeant.[4]  In essence, Defendants contend that if C.R.S. § 30–10–506 unequivocally vests county sheriff's with exclusive and final decision-making authority over the hiring and firing of sheriff's office personnel, that same unfettered discretion must extend to Defendant Wegener's right to demote subordinates.  The Motion to Dismiss further argues that Plaintiff Tonjes was not terminated or constructively discharged from the Sheriff's Office; rather he voluntarily quit.  Defendant Hancock maintains that he cannot be individually liable under the first claim for relief because he did not personally participate in the decision to demote Plaintiff Tonjes.  Finally, Defendants Wegener and Hancock maintain that they are entitled to qualified immunity because Plaintiff's first claim does not assert a cognizable due process violation.

Plaintiff asserts, to the contrary, the Complaint properly alleges a due process claim predicated on a "contractual and promissory right to be free from discipline and demotion without clearly specified cause."  More particularly, Mr. Tonjes argues that "Defendants' right to terminate at-will has no bearing on [their] right to discipline or demote inconsistent with the Manual" and that "Defendants' promises regarding discipline and demotion for cause created a constitutionally protected property interest in Plaintiff Tonjes' job."  As for Defendants' claim of qualified immunity, Mr. Tonjes maintains that United States Supreme Court and Tenth Circuit precedents "clearly establish" that "an implied contract or otherwise enforceable promise may give rise to a constitutionally protected property interest for due process purposes."  Finally, Mr. Tonjes asserts he was subjected to employment circumstances that were sufficiently intolerable to constitute constructive discharge.  He also contends, in the alternative, that proof of a

---

[4] The Sheriff's Office also relies on the same argument with respect to Plaintiff's claims for breach of contract and promissory estoppel.  The court addresses these claims here as well.

constructive discharge is not a required element of his due process claim and that a failure to show constructive discharge would only impact the scope of any economic damages he might have suffered.

The Due Process Clause of the "Fourteenth Amendment provides that no state shall 'deprive any person of life, liberty, or property, without due process of law.'" *Estate of DiMarco v. Wyo. Dept. of Corrections*, 473 F.3d 1334, 1339 (10th Cir. 2007) (quoting the Due Process Clause of the U.S. Const. amend. XIV, sec. 1). "To determine whether a plaintiff was denied procedural due process, we engage in a two-step inquiry: (1) Did the individual possess a protected interest to which due process protection was applicable? (2) Was the individual afforded an appropriate level of process?" *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir. 1998). *See also Steffey v. Orman*, 461 F.3d 1218, 1221 (10th Cir. 2006) ("[a] due process claim under the Fourteenth Amendment can only be maintained where there exists a constitutionally cognizable liberty or property interest with which the state has interfered"); *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000) (to prevail on a due process claim, a plaintiff must "first establish that a defendant's action deprived plaintiff of a protectible [sic] property interest").

"To demonstrate a property interest, 'a person clearly must have more than an abstract need or desire for [a certain benefit] . . . [h]e must have more than a unilateral expectation of it;' rather a person must have a 'legitimate claim of entitlement.'" *Reid v. Stanley*, No. 1:11–CV–2043, 2011 WL 6371793, at *4 (N.D. Ohio Dec. 20, 2011). The Tenth Circuit has held that "[t]he existence of a property interest is defined by existing rules or understandings that stem from an independent source such as state law – rules or understanding that secure certain benefits

and [ ] support claims of entitlement to those benefits." *Hennigh*, 155 F.3d at 1253. Thus "constitutionally protected property interests are created and defined by statute, ordinance, contract, implied contract and rules and understandings developed by state officials." *Hulen v. Yates*, 322 F.3d 1229, 1240 (10th Cir. 2003).

That same analysis governs whether there is a property interest in a particular employment status. *Hennigh,* 155 F.3d at 1254 (citing *Anglemyer v. Hamilton Cty. Hosp.*, 58 F.3d 533, 539 (10th Cir. 1995), stating a property interest *might* be created by specific statutory provisions or contract terms qualifying an employer's discretion to reassign or transfer the employee). *See also Greene v. Barrett*, 174 F.3d 1136, 1140 (10th Cir. 1999) (holding that state law "can create a protected property interest in a particular employment status or rank if it 'places substantive restrictions on the discretion to demote an employee, such as providing that discipline may only be imposed for cause'").

It is generally understood that an employee hired for an indeterminate period is an at-will employee. "This relationship means that either the company or the employee can terminate the employment relationship without cause and without notice, and that termination does not give rise to a cause of action." *Winkler v. Bowlmor AMF*, 207 F. Supp. 3d 1185, 1189 (D. Colo. 2016) (internal citations omitted). "However, this presumption is rebuttable." *Id. See also Hulen*, 322 F.3d at 1240 (the "general rule" that "no protected property interest is implicated when an employer reassigned or transfers" an employee "is not absolute if an employee can point to a specific contractual provision and surrounding circumstances establishing a property interest."). "In certain circumstances, an 'at-will' employee may enforce an employer's statements, such as those made in an employee manual, on a theory of (1) a breach of implied

contract or (2) promissory estoppel." *Winkler*, 207 F. Supp. 3d at 1189–90. *Cf. Silchia v. MC Telecomm's Corp.*, 942 F. Supp. 1369, 1375 (D. Colo. 1996) ("Even if there is a valid employment-at-will disclaimer in an employment handbook, an employer may nevertheless be found to have manifested an intent to be bound by its terms if the handbook contains mandatory termination procedures or requires 'just cause' for termination.")

Under Colorado law, "[e]ach sheriff may appoint as many deputies as the sheriff may think proper and may revoke such appointments at will; except that a sheriff shall adopt personnel policies, including policies for the review of revocation of appointments." Colo. Rev. Stat. § 30–10–506. The Park County Sheriff's Office Policy and Procedure Manual plainly states that "Park County, including the Sheriff's Office, is an 'at-will' employer." *See* Policy 303(III) set forth in Exhibit A (doc. #27–1) at page 9 of 105, attached to Plaintiff's response brief. Elsewhere, the Manual acknowledges that

> The Sheriff's Office is an "employment at will" employer. Sworn employees serve "at the pleasure" of the Sheriff. Both the Employee and the Sheriff's Office have the right to end employment at any time. Employees may be dismissed for reasons discussed in Chapter III, Section 320, Disciplinary Action.

*See* Policy 309(IV)(A)(4) set forth in Exhibit A (doc. #27–1) at page 24 of 105, attached to Plaintiff's response brief.

But, as the Tenth Circuit noted in *Williams v. McKee*, 655 F. App'x 677, 686 (10th Cir. 2016), a constitutionally protected claim of entitlement "may take the form of 'state statutes, local ordinances, established rules, or mutually explicit understandings." *Id.* at 686–87 (where plaintiff challenged his termination for failing to comply with an order issued by the sheriff, the Tenth Circuit noted "there [were] simply no facts in the amended complaint to support the assertion that . . . termination implicated a liberty interest").

Defendants rely on *Williams, Bristol v. Board of County Commissioners,* 312 F.3d 1213, 1219 (10th Cir. 2002) and *Seeley v. Board of County of Commissioners,* 791 P.2d 696 (Colo. 1990) to argue the Manual cannot be enforced because "self-imposed limitations on [a sheriff's] right to discharge employees at will are invalid." Doc. #13 (motion) at 6. *Seeley* and *Bristol* interpreted a former version of C.R.S. § 30–10–506 which provided "[e]ach sheriff may appoint as many deputies as he may think proper … and may revoke such appointments at his pleasure." C.R.S. § 30–10–506 (2005). In 2006, the legislature amended § 30–10–506 to read:

> Each sheriff may appoint as many deputies as the sheriff may think proper and may revoke such appointments at will; *except that a sheriff shall adopt personnel policies,* including policies for the review of revocation of appointments. Before revoking an appointment of a deputy, the sheriff shall notify the deputy of the reason for the proposed revocation and shall give the deputy an opportunity to be heard by the sheriff.

C.R.S. § 30–10–506 (in relevant part, emphasis added).

Since the 2006 amendment, the statute provides that sheriffs *may* terminate officers at will, but they shall adopt personnel policies. The statute does not limit sheriffs' discretion in determining what policies to adopt. The legislative history reflects the intent to authorize sheriffs' policies that limit the power to terminate employees at will. *See County Government— Sheriff Power—Limitations, an Act Concerning County Sheriffs, and in Connection Therewith, Limiting the Power of a Sheriff to Revoke the Appointment of a Deputy at Will…*, 2006 Colo. Legis. Serv. Ch. 43 (H.B. 06–1181) (West) (amending C.R.S. § 30–10–506, effective Aug. 9, 2006). To read C.R.S. § 30–10–506 as impliedly prohibiting sheriffs from adopting policies that limit their power to terminate (or demote, discipline, etc.) employees at will would make the amendment meaningless. *Williams'* quotation of *Bristol* postdates the statutory amendment but

13

is *dicta*. *Williams* addresses whether a county's personnel policies – not a sheriff's policies – gave contractual promises to employees in the sheriff's office, and concludes that only the sheriff had such authority. 655 F. App'x at 686–87. Post-2006, Sheriff Wegener has the ability to adopt policies that limit his power to terminate (demote, discipline, etc.) employees at will, and the prior law does not help Defendants.

Defendants' motion also cites with favor the decision in *Nicastle v. Adams County Sheriff's Office*, No. 10–cv–00816–REB–KMT, 2011 WL 1598062 (D. Colo. Apr. 28, 2011). *Nicastle* does not support dismissal here. First, in considering the officer's argument that personnel policies gave him a property interest in his continued employment in the sheriff's office, *Nicastle* implicitly recognizes that sheriffs are authorized to adopt personnel policies that limit their right to terminate deputies at will. *Id.* at *5. This contradicts Defendants' argument that the Manual is unenforceable. Second, in *Nicastle* the district court granted the defendants' motion for summary judgment after noting the plaintiff-deputy failed to cite any specific policies that supported his expectation of notice and a fair and adequate opportunity to be heard before he was demoted or terminated. *Id.* at *5 (noting that Colo. Rev. Stat. § 30–10–506 "provides procedural detail but does not place substantive restrictions on the discretion of a sheriff to revoke an appointment or to demote an employee"). *Compare Robinson v. Robinson,* No. 05–cv–01433REBPAC, 2006 WL 726296, at *2 (D. Colo. Mar. 20, 2006) (in entering summary judgment in favor of defendant, the court held that the plaintiff who resigned from his position did not show a procedural due process violation; the plaintiff "affirmed that there is no custom or policy of the Sheriff's office at issue in this case" because the Sheriff's Office policy and procedure manual explicitly stated that "[n]o portion of this manual or this policy shall constitute

14

a contract between the Sheriff and the member"), *rev'd and remanded on other issue,* 226 F. App'x 805 (10th Cir. 2007).

In this case, however, Plaintiff Tonjes alleges that the Manual "promises Sheriff's Office employees that it will follow a specific disciplinary process and informs them of the permitted ranges of discipline for various infractions." *See* Complaint at ¶ 18. The Complaint cites various provisions of the Manual, *see id.* at ¶¶ 14–19, and both sides have attached pertinent portions of the Manual to their briefs.

Unlike in *Nicastle,* the Manual has specific provisions that address "Conduct Rules and Regulations" (Policy 314), "Complaint Handling/Investigation Procedures" (Policy 318), and "Corrective and Disciplinary Action" (Policy 320). Policy 314 governing Conduct Rules and Regulations states that "[i]t shall be the policy of the Sheriff's office to establish general rules of conduct for its employees" and "[t]hese rules will be established in accordance with existing laws as expected by law enforcement personnel and the citizens of this community."[5] *See* Policy 314(III) set forth in Exhibit A (doc. #27–1) at page 37 of 105, attached to Plaintiff's response brief. This same Policy states that

> Members will not commit any act that constitutes a violation of any Office rules, regulations, procedures, responsibilities, instructions or written directive. In the event of improper action or breach of discipline, *it will be presumed that the employee was familiar with the rules, policies, procedures, responsibilities, instructions or orders.* Furthermore, members will not aid, abet, or incite another in the violation of rules, duties, orders, policies, or procedures of the Office.

---

[5] The same Policy states that "[r]ules and regulations are designed as guidelines for behavior in an organization." *See* Policy 314(IV)(A) set forth in Exhibit A (doc. #27–1) at page 37 of 105, attached to Plaintiff's response brief.

*See* Policy 314(IV)(A)(2) set forth in Exhibit A (doc. #27–1) at page 37 of 105 (emphasis added). Included in the Conduct Rules and Regulations are provisions that require "members [to] treat Supervisors and Command personnel with the respect and courtesy due them as Supervisors and Command personnel," and for all "members to treat other members of the Office with the respect and courtesy due them as fellow employees." *See* Policy 314(IV)(A)(11) set forth in doc. #27–1 at page 38 of 105. Members of the Sheriff's Office "will not engage in conduct prejudicial to the good order and discipline" and will "conduct themselves at all times both on and off duty in a manner that reflects most favorably on the Office." *See* Policy 314(IV)(A)(24) set forth in doc. #27–1 at page 40 of 105. Sheriff's Office personnel "will not criticize the Office . . . except through official channels and by use of the prescribed procedures," but "*[t]his rule is not intended to preclude the offering of personal opinions, while off duty, in the course of conversations deemed to be private*." *See Id.* at Policy 314(IV)(A)(26) (emphasis added). Finally, "[m]embers will not utter any disrespectful, mutinous, insolent, or abusive language toward any member, supervisor, subordinate, staff officer or citizen." *See Id.* at Policy 314(IV)(A)(27).

Policy 318 provides "guidance for the proper and consistent handling of both internal[6] and external complaints," and states that the "policy of the Sheriff's Office" is "to conduct fair and impartial investigations of legitimate complaints." *See* Policy 318(I) and (III) set forth in doc. #27–1 at page 53 of 105. Level I and II[7] complaints will be addressed "in the same format"

---

[6] "Internal complaints" are "made by a member of the Sheriff's Office." *See* doc. #27–1 at Policy 318(II), page 53 of 105.

[7] Level I complaints include "serious policy violations" such as "employee against employee complaints" and potentially raise "[a]ll levels of discipline." Level II complaints address "[p]olicy violations such as Disobedience to Orders, Performance of Duty, or willful misconduct." *See* Policy 318(IV)(B)(1) and (2) set forth in doc. #27–1 at page 54 of 105.

to "*ensure uniformed [sic] complaint procedures*." For the foregoing complaints, "[t]he Undersheriff will . . . hold a fact-finding meeting with the accused employee" and "will then make final recommendations to the Sheriff." *See* Policy 318(IV)(C)(1) and (2) set forth in doc. #27–1 at page 54–55 of 105 (emphasis added). For Level III complaints[8] the employee's immediate supervisor "will forward the complaint and any other information retrieved during the Preliminary Investigation, to the accused employee for a written response," and "[t]he Division Commander will have the final review of authority over Level III complaints." *See Id.* at Policy 318(IV)(D), page 55 of 105.

The Manual addresses Corrective and Disciplinary Action in Policy 320. The "purpose" of this Policy is "[t]o provide guidance on the proper administration of corrective action and discipline to members of the Sheriff's Office," while the "policy" is to provide *"fair and consistent, disciplinary sanctions" by "conforming* to the established due process requirements." Policy 320 states that "[t]hrough a *defined and formal process*, the high standards of the Sheriff's Office will be maintained." *See* Policy 320(I) and (III) set forth in doc. #27–1 at page 60-61 of 105 (emphasis added). Finally, "[t]he Sheriff's policy on the administration of corrective action is to provide guidance and fairness. The Sheriff reserves the ability to mandate disciplinary action to a lesser or greater level than the chain of command's recommendation."[9] *See* Policy 320(IV) (F) set forth in doc. #27–1 at page 64 of 105.

---

[8] Level III complaints address, *inter alia,* "[c]ourtesy complaints of rudeness, disrespect, impartiality, procedure complaints of procedural complaints of procedures specifically related to the employee's duty assignment . . . [or] supervisory issues such as . . . minor procedural errors." The range of discipline for these violations would be "Letter of Counseling, Probation, Letter of Reprimand." *See* Policy 318(IV)(B)(3) set forth in doc. #27–1 at page 54 of 105.

[9] Level I or II disciplinary actions are made by the Undersheriff, with appeals to the Sheriff. Level III disciplinary actions are made by the accused's Division Commander, with no right of

Plaintiff Tonjes alleges he "had a property interest in his position as Patrol Senior Sargeant and in continuing employment with [the] Park County Sheriff's Office by virtue of its personnel policies regarding demotions and discipline." *See* Complaint at ¶ 48. The Complaint asserts that Defendant Wegener imposed sanctions that were so onerous as to constitute a constructive discharge. *Id.* at ¶ 43. More importantly, for purposes of his procedural due process claim, Mr. Tonjes asserts Defendant Wegener wrongfully violated numerous provisions of the Manual that provided employees with clearly articulated protections. *Id.* at ¶¶ 14–19, 41–42 and 50. *Cf. Cronk v. Intermountain Rural Electric Ass'n*, 765 P.2d 619, 622–23 (Colo. App. 1988) (in reversing summary judgment in favor of the defendant, the court held the employee manual offered more than "general provisions" and "set[] forth certain express events which might cause the employee to be terminated," and thus could constitute an implied contract); *Duran v. Flagstar Corp.*, 17 F. Supp. 2d 1195, 1201–02 (D. Colo. Aug. 26, 1998) (denying defendant's argument on summary judgment that employee handbook expressly disclaimed contractual intent, inferring the provision "applied to the *term* of employment–not the *conditions* of employment"). In short, Defendants' motion relies on the Manual's provisions that favor Defendants' position that there was no contract limiting the Sheriff's discretion in demoting Mr. Tonjes, but the motion also ignores the many, specific provisions discussed above that support Mr. Tonjes' allegations that the Manual was a contract limiting that discretion to the substantive reasons and processes for demotion provided in the Manual. This is a factual issue that cannot be resolved on a motion to dismiss.

---

appeals to either the Undersheriff or Sheriff. *See* Policy 320(IV)(A) and (E) set forth in doc. #27–1 at page 62–63 of 105.

As for Plaintiff's asserted constructive discharge, the court looks to prevailing case law in the Tenth Circuit and other federal jurisdictions. "An employee's resignation or retirement from public employment is 'presumed to be voluntary.'" *Speziale v. Bethlehem Area Sch. Dist.*, 266 F. Supp. 2d 366, 372 (E.D. Pa. 2003) (quoting *Leheny v. City of Pittsburgh*, 183 F.3d 220, 227 (3rd Cir. 1999)).

> This presumption remains intact until the employee presents evidence to establish that the resignation . . . was involuntarily procured. If an employee retires . . . of his own free will, even though prompted to do so by some action of his employer, he is deemed to have relinquished his property interest in his continued employment for the government, and cannot contend that he was deprived of his due process rights.

*Leheny,* 183 F.3d at 227. *Cf. Cacy v. City of Chickasha,* 124 F.3d 216 (Table), 1997 WL 537864, at *6 (10th Cir. Sept. 2, 1997) (noting that if the plaintiff voluntarily resigned from his government employment, he has no property interest claim under the due process clause); *Parker v. Bd. of Regents of Tulsa Jr. Coll.,* 981 F.2d 1159, 1162 (10th Cir. 1992) (same); *Burdine v. Greenville Tech. Coll.*, No. 6:08–cv–03764–JM, 2010 WL 5211544, at *5 (D.S.C. Dec. 16, 2010) ("[a]n employee is entitled to relief absent a formal discharge if an employer deliberately makes the working conditions intolerable in an effort to induce the employee to quit," internal quotation marks omitted). *See also Heutzenroeder v. Mesa Cty. Valley Sch. Dist. 51,* 391 F. App'x 688, 693 (10th Cir. 2010) ("[g]enerally, whether a constructive discharge occurred is a question of fact to be resolved by the jury").

The Tenth Circuit has held that a public employee may assert a due process claim predicated on constructive discharge, standing alone, where the employer "intentionally or knowingly creat[es] working conditions so intolerable that a reasonable employee would quit."

*Lauck v. Campbell Cty.*, 627 F.3d 805, 813 (10th Cir. 2010). The due process violation occurs to the extent the employer is seeking to circumvent due process protections and thereby violate the employee's due process or contract rights. *Id.* When the employee asserts a due-process constructive-discharge claim, he must show: (1) that a property right was violated; (2) that the employer knew or intended that such intolerable conditions were being imposed on the employee; and (3) that the employee was denied the necessary procedure to determine whether the contemplated action would violate the employee's contractual rights. *Lauck,* 627 F.3d at 813 (holding in the context of a motion for summary judgment, that the plaintiff deputy sheriff did not satisfy these elements because his transfer did not change his pay or rank and did not materially change the scope of his law enforcement authority, because there was no evidence to suggest that the employer knew these new conditions would be intolerable, and because he was afforded due process protections).

In this case, Plaintiff Tonjes argues that his circumstances materially differ from those confronting the plaintiff in *Lauck,* since Mr. Tonjes was demoted three levels and would have suffered a significant reduction in pay. *See, e.g., Potts v. Davis Cty.,* 551 F.3d 1188, 1193 (10th Cir. 2009) (former officer did not state § 1983 claim for constructive discharge by reassignment because his rank and salary remained the same); *James v. Sears, Roebuck & Co.,* 21 F.3d 989, 993 (10th Cir. 1994) (ADEA claim). Mr. Tonjes further alleges that Defendant Wegener's actions departed from the policies and procedures set forth in the Manual, including the admonition in Policy 320 that corrective or disciplinary action be imposed through "a defined and formal process" that would ensure "fair and consistent, disciplinary sanctions" in conformity with "established due process requirements."

Although this is a close issue, in the end, the court must adhere to the constraints imposed by Rule 12(b)(6) and construe the facts alleged in the Complaint in a light most favorable to Mr. Tonjes. On that limited record, I conclude that the allegations advanced in support of Plaintiff's due process claim are sufficient to withstand challenge under Rule 12(b)(6). Mr. Tonjes points to specific provisions of the employee Manual as promising formal processes for demotions and discipline. Policy 309(IV)(A)(4) states that employment is "at will," but it also states that the employee may be dismissed for the reasons set forth in the policies of Section 320 – the section that provides formal processes for discipline or corrective action that Defendant Wegener allegedly did not follow. Policy 318(IV)(B) also provided that complaints of rudeness or discourtesy could lead to only limited forms of discipline that did not include demotion, and Plaintiff Tonjes alleges Wegener purported to base his demotion on this type of complaint.

Mr. Tonjes' allegations contrast to cases in which the court has dismissed a government employee's claim for lack of a property interest. *See, e.g., Rooker,* 841 F. Supp. 2d at 1217–18 (employee manual provided an opportunity to be heard before termination, but also specified at-will employment and "failure to adhere to any provision hereof shall not create any additional rights or remedies"); *Jeffers v. Denver Pub. Sch.,* No. 16–cv–02243–CMA–MJW, 2017 WL 2001632, at *5 (D. Colo. May 11, 2017) (manual stated "employment may be terminated for any time, with or without cause"), *rec. adopted,* 2017 WL 5441612 (D. Colo. June 1, 2017), *recon. den'd*, 2017 WL 5256359 (D. Colo. Nov. 13, 2017).

In short, Mr. Tonjes plausibly alleges the employee manual constitutes a contract limiting the reasons for which he could be demoted and the process by which demotion could be

executed.  The first, fourth (breach of contract) and fifth (promissory estoppel)[10] claims for relief survive Defendants' motion to dismiss.  At this time, the court offers no views on whether Plaintiff's claims can be sustained on a broader record.

1.      *Defendant Hancock's Personal Participation*

Defendant Hancock argues that he should be dismissed from this claim because Plaintiff "does not allege any personal participation by Defendant Hancock in effectuating Plaintiff's demotion."  Hancock argues that "[i]ndividual liability under 42 U.S.C. § 1983 must be based on the defendant's personal participation in the allegedly unconstitutional conduct," citing *Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011).  Mr. Tonjes does not dispute this legal standard applies and points to his allegations that Hancock

> informed Sheriff Wegener of his meeting with Sgt. Tonjes and Undersheriff Gore and the statements Gore made regarding the Wirth situation.  At that time, Wegener and Hancock decided to discipline or even fire Plaintiff Tonjes and Undersheriff Gore because of their opinions regarding how the Wirth situation was handled.

Complaint at ¶ 34.  Mr. Hancock replies that "Plaintiff has not shown how Defendant Hancock's alleged act of reporting relevant information to his supervisor, regarding a discussion pertaining to an ongoing investigation, was sufficient to constitute personal participation or causation of such a violation" of Plaintiff's due process rights with respect to his property interest in continued employment with the Sheriff's Office.

"Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated

---

[10] Defendants briefly argue Plaintiff Tonjes cannot meet the detrimental reliance element of this claim because he voluntarily resigned.  Defendants have not shown that at this phase the court should analyze that question differently than it has for the due process claim.

the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Here Mr. Tonjes alleges that the decision to discipline or fire him was a joint decision of Sheriff Wegener and Captain Hancock. He also alleges that Wegener demoted him because of the information that Hancock reported regarding his meeting with Gore and Tonjes.

Mr. Tonjes does not allege that Hancock was his supervisor, that Hancock himself otherwise had the authority to discipline or fire him, or that Hancock actually participated in effectuating the demotion. But Mr. Hancock has not shown such allegations to be necessary for the personal participation element. It suffices if Mr. Hancock "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Dodds v. Richardson,* 614 F.3d 1185, 1195–96 (10th Cir. 2010) (noting that § 1983 states "[a]ny official who 'causes' a citizen to be deprived of her constitutional rights can also be held liable," and the requisite causal connection can be met by "showing the defendant set in motion" such a series of events). *See also Poolaw v. Marcantel,* 565 F.3d 721, 732–33 (10th Cir. 2000); *Hoffman v. Kelz,* 443 F. Supp. 2d 1007, 1013–14 (W.D. Wis. 2006) (former police chief's § 1983 claim against district attorney who allegedly persuaded the village board to not renew chief's contract based on false statements survived Rule 12).

Mr. Tonjes' allegations are somewhat light on asserting that when Captain Hancock informed Sheriff Wegener of the meeting with Gore and Tonjes, he intended or should have known that information would cause Wegener to terminate or demote Mr. Tonjes in violation of the Sheriff's personnel policies. However, a jury could reasonably infer that fact from Plaintiff Tonjes' allegations that at the meeting, Hancock became angry with Gore and Tonjes and in

going to Sheriff Wegener was motivated by a desire to retaliate. Again, the court does not purport to decide whether this claim can survive against Hancock on a broader record.

2. *Defendants Wegener and Hancock's Assertion of Qualified Immunity*

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (internal quotation marks and citations omitted). *See also Duncan v. Gunter*, 15 F.3d 989, 992 (10th Cir. 1994) (same) internal quotation marks and citations omitted). Stated differently, the affirmative defense of qualified immunity "protects all but the plainly incompetent [government official] or those who knowingly violate the law." *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1185 (10th Cir. 2001). Whether a defendant is entitled to qualified immunity is a legal question. *Wilder v. Turner*, 490 F.3d 810, 813 (10th Cir. 2007).

> First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. Second ... the court must decide whether the right at issue was clearly established at the time of the defendant's alleged misconduct. With regard to this second [prong], the relevant, dispositive inquiry … is whether it would be clear to a reasonable officer that his conduct was unlawful under the circumstances presented

*Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009) (internal quotation marks and citations omitted). "Qualified immunity is applicable unless" the plaintiff can satisfy both prongs of the inquiry. *Id. See also Verdecia v. Adams*, 327 F.3d 1171, 1174 (10th Cir. 2003) (once a defendant asserts qualified immunity, the burden shifts to the plaintiff to show the defendant violated a constitutional or statutory right that was clearly established at the time).

"The 'clearly established' inquiry examines whether the contours of the constitutional right were so well-settled, in the particular circumstances presented, that 'every reasonable [state] official would have understood that what he is doing violates that right.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Stated differently, "the salient question ... is whether the state of the law at the time of [the] incident provided 'fair warning' to the defendants that their alleged conduct was unconstitutional." *Tolan v. Cotton,* __ U.S. __, 134 S. Ct. 1861, 1866 (2014) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). *See also Pompeo v. Bd. of Regents of the Univ. of N.M.*, 852 F.3d 973, 981 (10th Cir. 2017) (there "ordinarily must be a Supreme Court or Tenth Circuit opinion on point, or the clearly established weight of authority from other circuits must point in one direction"). "Although plaintiff can overcome a qualified-immunity defense without a favorable case directly on point, existing precedent must have placed the statutory or constitutional question 'beyond debate.'" *Garcia v. Escalante*, 678 F. App'x 649, 654 (10th Cir. 2017) ("The dispositive question is 'whether the violative nature of the *particular conduct* is clearly established.'") (internal quotation marks omitted).[11]

> Officials do not lose their qualified immunity because of a mistaken, yet reasonable belief, nor do officials lose their immunity because of a reasonable mistake as to the legality of their actions. [T]he purpose of the qualified immunity doctrine is to provide ample room for mistaken judgments and to protect all but the plainly incompetent or those who knowingly violate the law.

*Dupree v. City of Jacksonville*, No.4:08CV00327 JMM, 2009 WL 1392578, at *6 (E.D. Ark. May 13, 2009) (internal citation and quotation marks omitted). Thus, "if a reasonable officer

---

[11] The Supreme Court recently cautioned that "'clearly established law' should not be defined 'at a high level of generality;'" rather "the clearly established law must be 'particularized to the facts of the case.'" *White v. Pauly*, __ U.S. __, 137 S. Ct. 548, 552 (2017) (per curiam). "Otherwise, [p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.*

might not have known for certain that the conduct was unlawful—then the officer is immune from liability." *Ziglar v. Abbasi*, __ U.S. __, 137 S. Ct. 1843, 1867 (2017).

"Asserting a qualified immunity defense via a Rule 12(b)(6) motion ... subjects the defendant to a more challenging standard of review than would apply on summary judgment," as the court must consider only the facts alleged in the plaintiff's complaint and must accept those well-pled facts as true and view the allegations in the light most favorable to the plaintiff. *Sanchez v. Labate*, 564 F. App'x 371, 373 (10th Cir. 2014). In contrast, under Rule 56, the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact" and the non-movant fails to come forward with sufficient evidence to demonstrate the existence of such a genuine dispute. *Cf. Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 772 (3d Cir. 2013). In short, the burden on the non-moving party is significantly different depending upon whether the movant is seeking relief under Rule 12(b)(6) or Rule 56.[12]

In this case, the foregoing discussion of Colorado law shows that it was reasonably clear that the Park County Sheriff's Office employee manual could constitute a contract governing the reasons that an officer could be demoted and the process for doing so, and that demoting Mr. Tonjes without complying with that manual would deprive Mr. Tonjes of a property interest without due process. Defendants Wegener and Hancock can revisit this issue at summary judgment on a broader record, but the court concludes that Tonjes' allegations suffice to overcome Defendants' qualified immunity at this phase.

---

[12] Perhaps not surprisingly, many of the cases cited in Defendants' briefing involved motions for summary judgment that were resolved in favor of the defendant(s).

*B.*    *Plaintiff's First Amendment Claim*

Defendants contend that Plaintiff's second claim fails to state a cognizable violation of the First Amendment because Mr. Tonjes never actually engaged in protected activity sufficient to trigger his constitutionally protected right to "expressive association."  More particularly, Defendants contend that Plaintiff's "unclear and unspecific allegations" do not encompass any constitutionally protected associational activities.  They argue that the Complaint merely alleges that Mr. Tonjes was physically present when Undersheriff Gore expressed a particular view that appeared to upset Captain Hancock.  The motion further argues that Mr. Tonjes has not alleged facts that would plausibly demonstrate a causal connection between his demotion and his alleged "association" with Undersheriff Gore.  Finally, Defendants Wegener and Hancock insist they are entitled to qualified immunity in the absence of a properly alleged First Amendment violation.

Plaintiff's First Amendment claim asserts that Mr. Tonjes' retaliatory demotion was motivated by his "associational activities" with former Undersheriff Gore that "touched on matters of public concern," and that Plaintiff was not acting pursuant to his official duties in exercising his "associational rights."  Mr. Tonjes argues that the Complaint alleges facts that support each and every element for a First Amendment retaliation claim based upon a freedom of association, and that Supreme Court and Tenth Circuit precedents clearly establish "that an employer may not terminate an employee because the employee was associated with another individual who exercised Free Speech rights."[13]

---

[13] The Tenth Circuit refers to two senses of the freedom of association, the "intrinsic" relating to "certain intimate human interactions" and the "instrumental" relating to "associations necessary to engage in the enumerated First Amendment rights."  *See Merrifield v. Bd. of Cty. Comm'rs for Cty. of Santa Fe*, 654 F.3d 1073, 1080 (10th Cir. 2011).  Mr. Tonjes alleges the latter.

In *Roberts v. United States Jaycees* 468 U.S. 609, 617–18 (1984), the Supreme Court recognized that the First Amendment encompasses a right to "expressive association." The freedom of expressive association affords "protection to collective effort on behalf of shared goals;" *i.e.,* "the right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious and cultural ends." *Id.* at 622. The Supreme Court in *Roberts* held that while the right to associate for expressive purposes is not absolute and may be restricted to serve compelling state interests, the freedom of expressive association prevents the government from penalizing an individual because of their membership in a disfavored group, from requiring disclosure of an individual's membership in a group seeking anonymity, or interfering with the internal organization or affairs of a group. *Roberts,* 468 U.S. at 622–23. *Cf. Schalk v. Gallemore*, 906 F.2d 491, 497–98 (10th Cir. 1990) (citing *Roberts*, 468 U.S. at 617– 18).

> The right of expressive association – the freedom to associate for the purpose of engaging in activities protected by the First Amendment, such as speech, assembly, petition for the redress of grievances, and the exercise of religion – is protected by the First Amendment as a necessary corollary of the right that the amendment protects by its terms. The state may not take a materially adverse action against its employee in retaliation for exercising First Amendment associational rights.

*Trigo v. City of Doral*, 663 F. App'x 871, 874–75 (11th Cir. 2016).

*Roberts* and its progeny make clear that the freedom of expressive association protects the collective interests of a group whose members share common interests or objectives. *See, e.g., Dawson v. Delaware*, 503 U.S. 159, 163 (1992) (recognizing that the First Amendment protects an individual's right to associate with others holding similar views) and *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). "To determine whether a group is protected by the First

Amendment's expressive associational right, we must determine whether the group engages in

'expressive association.'  The First Amendment's protection of expressive association is not

reserved for advocacy groups.  But to come within its ambit, a group must engage in some form

of expression, whether it be public or private."  *Id.*

> "[F]reedom of speech" means more than simply the right to talk
> and to write.  It is possible to find some kernel of expression in
> almost every activity a person undertakes – for example, walking
> down the street or meeting one's friends at a shopping mall – but
> such a kernel is not sufficient to bring the activity within the
> protection of the First Amendment. . . . [W]e do not think the
> Constitution recognizes a generalized right of "social
> association[.]"

*City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989).

Mr. Tonjes' First Amendment claim is subject to additional considerations by virtue of

his status as a public employee.  When the government is functioning as employer, the

employee's rights may be constrained to the extent that the First Amendment activity in question

is insubordinate, disruptive, or demoralizing.  *Merrifield v. Bd. of Cty. Comm'rs*, 654 F.3d 1073,

1079 (10th Cir. 2011) ("When a citizen enters government service, the citizen by necessity must

accept certain limitations on his or her freedom.  Government employers, like private employers,

need a significant degree of control over their employees' words and actions; without it, there

would be little chance for the efficient provision of public services.") (quoting *Garcetti v.

Ceballos*, 547 U.S. 410, 418 (2006)).

To show that a government employer retaliated for "exercising the … freedom of

association for the purpose of engaging in speech, assembly, or petitioning for redress of

grievances," the government employee must show that the association "involved a matter of

public concern." *Merrifield,* 654 F.3d at 1084–85. This limitation prevents constitutionalizing "everyday employment disputes." *Id.*

> Speech deals with matters of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community," ... or when it "is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public."

*Snyder v. Phelps,* 562 U.S. 443, 453 (2011). *See also Schalk*, 906 F.2d at 495.

Thus, to prevail on his First Amendment retaliation based on his right of expressive association, Mr. Tonjes must allege facts that plausibly demonstrate (1) he engaged in First Amendment activity that involved a matter of public concern; (2) his interests in that protected activity outweighed the Sheriff Department's interest in regulating that activity; and (3) Plaintiff's protected activity was a substantial motivating factor in the decision to take adverse action against him. If Mr. Tonjes establishes the foregoing elements, Defendants then must show that they would have taken the same action against Plaintiff in the absence of his alleged protected activity. *See Cillo v. City of Greenwood Village,* 739 F.3d 451, 460–61 (10th Cir. 2013).

Defendants first argue that the Complaint fails to allege that Mr. Tonjes was associated with Undersheriff Gore *for the purpose of* engaging in protected speech. But the Tenth Circuit has simply required the government employee's association to "involve" a matter of public concern; the association could be a "means to effectuate" or simply "enable [the plaintiff] to speak or petition" on a matter of public concern. *Merrifield*, 654 F.3d at 1084. "[A] public employee bringing a First Amendment freedom of association claim must persuade the court that the associational conduct at issue touches on a matter of public concern," which in turn is

"determined by the content, form, and context of a given statement, as revealed by the whole record." *Lunch v. Ackley,* No. 3:12–cv–537 (MPS), 2014 WL 4782812, at *18 (D. Conn. Sept. 24, 2014). *See also Snyder*, 562 U.S. at 453 (same analysis for government employee's freedom of speech claim); *Russo v. City of Hartford*, 341 F. Supp. 2d 85, 96 (D. Conn. 2004) (the court should consider whether the public employee's "conduct, taken as a whole, was actually meant to address matters of public concern, or was simply a vehicle for furthering her private interests"). Speech that encompasses issues of public concern does not lose its First Amendment protection simply because some personal concerns are also included. *Hulen v. Yates,* 322 F.3d 1229, 1238 (10th Cir. 2003). The same is true of the right of association. *See, e.g., Brammer-Hoelter v. Twin Peaks Charter Acad.,* 492 F.3d 1192, 1206, 1209 (10th Cir. 2007) (four of twelve topics discussed by public employees were matters of public concern, thus their freedom of association retaliation claim survived summary judgment).

For purposes of stating a claim, the Complaint sufficiently alleges that Mr. Tonjes was engaged in protected expressive activities with Undersheriff Gore following the fatal shootings on February 24, 2016. Mr. Tonjes alleges that he and Undersheriff Gore agreed that the deaths of Corporal Carrigan and Mr. Wirth, as well as the injuries sustained by two other deputies, were caused "by the inappropriate and reckless orders of Sheriff Wegener and Captain Hancock." While off duty on February 26, 2016, Mr. Tonjes and Undersheriff Gore together visited Captain Hancock at his home to discuss the Wirth shooting. During the ensuing exchange, Undersheriff Gore stated that he held the Sheriff responsible for the unnecessary violence, death and injuries at the Wirth eviction. *Cf. Behne v. Halstead,* No. 1:13–CV–0056, 2014 WL 1689950, at *18–19 (M.D. Pa. Apr. 29, 2014) (holding that First Amendment rights extend to an individual who

suffers adverse employment action because of their association with another person's speech). The Complaint further alleges that between February 26, 2016 and February 29, 2016, Captain Hancock informed the Sheriff of his exchange with Tonjes and Gore, and that a decision was made to discipline or potentially fire Plaintiff based on what Undersheriff Gore had expressed at the Hancock residence. On February 29, 2016, Sheriff Wegener announced that he was demoting Plaintiff by three grade levels based upon what Mr. Tonjes asserts were unfounded allegations of misconduct directed at other officers. Plaintiff adequately pleads a claim that his association with Gore involved speech on a matter of public concern.

Defendants argue that "[a]n isolated 'kernel of expression' is insufficient to bring Plaintiff's alleged 'association' within the protection of the First Amendment." Doc. #13 (motion) at 15, citing *Dillon v. Twin Peaks Charter Acad.*, 406 Fed. App'x. 253, 259 (10th Cir. 2010). *Dillon* rejects a public employee's argument that the right to association extends beyond intrinsic and expressive associations to any form of association. This is not at issue here. Mr. Tonjes alleges he had an expressive association. Defendants argue the alleged association was just two "private conversations concerning [Plaintiff and Undersheriff Gore's] official duties," citing *Brammer-Hoelter*, 492 F.3d at 1205; *Hom v. Squire*, 81 F.3d 969, 974 (10th Cir. 1996); and *McEvoy v. Shoemaker*, 882 F.2d 463, 466 (10th Cir. 1989). These cases found internal employment complaints were not matters of public concern, but assertions of potential illegal conduct by government officials, whether their employer's charter would be renewed, and upcoming board elections were public concerns and thus protected speech. *Brammer-Hoelter*, 402 F.3d at 1206; *Hom,* 81 F.3d at 974; *McEvoy,* 882 F.3d at 466 (finding police officer's letter to city council complained of internal problems and mismanagement in police department, not

misconduct by officials). Mr. Tonjes' allegations fall within the latter: the fatal firefight at the Wirth residence was not merely an internal employment complaint but was a matter of public concern.

Defendants also argue the Complaint fails to establish facts demonstrating the required causal connection. Defendants recognize, however, that the element simply requires the retaliation to be a "substantial" motivating factor for the demotion, not the sole cause. Doc. #30 (reply brief) at 18 (citing *Cillo*, 739 F.3d at 461). A plaintiff can assert a claim for First Amendment retaliation by "showing that the protected activity was close in time to the adverse action." *Colvin v. State Univ. Coll. at Farmingdale*, No. 13–cv–3595 (SJF)(ARL), 2014 WL 2863224, at *20 (E.D.N.Y. Jun. 19, 2014). Moreover, a pleading alleges facts sufficient to assert a plausible claim under the First Amendment based upon a "broad array" of circumstances that include temporal proximity, intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reason for taking adverse action, or "any other evidence of record sufficient to support the inference of causality." *Behne*, 2014 WL 1689950, at *15.

Finally, Defendants Wegener and Hancock's assert qualified immunity, but particularly since *Merrifield*, the law in the Tenth Circuit clearly recognizes that public employees retain their First Amendment right to associate for expressing speech on a matter of public concern. A reasonable officer in the Sheriff's Department would know that demoting a deputy, when substantially motivated by retaliation for the deputy's association with another who expressed an opinion on the Wirth incident, would violate the deputy's First Amendment rights. Defendants Wegener and Hancock are free to raise this issue on a broader record, but the court concludes that the second claim for relief withstands challenge under Rule 12(b)(6).

C.      *Plaintiff's Due Process Liberty Interest Claim*

The Fourteenth Amendment protects a plaintiff's liberty interest to be free from adverse employment action that "creates a false and defamatory impression" and thereby forecloses other employment opportunities.  To assert a viable deprivation of a liberty interest, Plaintiff must come forward with evidence plausibly demonstrating the Defendants Wegener and the Sheriff's Office made: (1) a statement that impugned Mr. Tonjes' good name, reputation, honor, or integrity; (2) the statement was false or "gave a false impression;" (3) the statement was made during the course of termination and foreclosed other employment opportunities; and (4) the statement was publically disclosed.  *See, e.g., McDonald v. Wise*, 769 F.3d 1202, 1212 (10th Cir. 2014) (citing *Workman v. Jordan*, 32 F.3d 475, 481 (10th Cir. 1994); *Melton v. City of Oklahoma City,* 928 F.2d 920, 930 (10th Cir. 1991)).  Defendants contend that Mr. Tonjes' third claim for relief must be dismissed because the Complaint fails to allege facts that would support the first, second, or third elements of this claim.

The Complaint alleges that on February 29, 2016, Plaintiff Tonjes was told by Sheriff Wegener that he was being demoted three levels because he allegedly had "yelled" at Corporal Carrigan and Master Deputy Edward Goodman on some unspecified occasions.  Although Plaintiff denied that he had engaged in improper behavior toward either subordinate, Sheriff Wegener "ignored Sgt. Tonjes' rebuttal" and told him to report to work the next day as a patrol officer.  The Complaint also alleges that Defendant Wegener did not give Plaintiff Tonjes notice of any allegations made against him and did not follow Sheriff Office policies that would have allowed Mr. Tonjes an opportunity to appeal the demotion decision.  On that same day, Plaintiff

Tonjes resigned after concluding that "his working conditions had become intolerable and that it was no longer reasonable for him to continue working for the Sheriff's Office."

The Complaint further asserts that on March 2, 2016, Sheriff Wegener told a Denver news reporter that he had "made the decision to demote Sgt. Tonjes and that 'it was related to the handling of how the deputies responded [at the Wirth scene].'" The reporter subsequently announced that "a Park County Sheriff Sargent was in the process of being demoted and then resigned Monday over the tactics that lead [sic] to the Feb. 24 death of Cpl. Nate Carrigan." Complaint at ¶ 44. Plaintiff's response brief focuses on Wegener's statement to the reporter as the basis for this claim.

In the oral argument, the parties and court discussed several issues with respect to this claim, including whether Plaintiff Tonjes had to allege a literally false statement or if a statement that gives a false impression suffices. In the court's further research after the oral argument, the Tenth Circuit clearly holds the latter. *McDonald*, 769 F.3d at 1212. In *McDonald*, the court reversed the dismissal of a public employee's liberty interest claim because a literally false statement was not required.

> The district court concluded that Mr. McDonald failed to plead facts sufficient to satisfy *Workman*'s falsity prong. It determined that Ms. Miller and Mayor Hancock's statements were not false because Mr. McDonald "*was* terminated because of 'allegations of serious misconduct.'" ... We disagree. … Even if the Mayor only stated that Mr. McDonald was fired because of allegations of serious misconduct, his termination of Mr. McDonald due to the allegations *gives the false impression* that Mr. McDonald did in fact commit serious misconduct.

*Id.* (second emphasis added, citing *Melton,* 928 F.2d at 930).  Plaintiff Tonjes plausibly alleges that Sheriff Wegener's statement to the reporter gave a false impression that the fatalities and injuries incurred in the Wirth incident were Mr. Tonjes' fault.

However, Defendants are correct that the third element (statement made during the course of termination and foreclosed other employment opportunities ) requires foreclosure of other employment opportunities, and Mr. Tonjes does not allege such facts.  At oral argument, Mr. Tonjes argued this is not required because (in his view) he alleges the statement occurred in the course of his demotion and constructive discharge.  Although in some earlier cases the Tenth Circuit "phrased th[e] third element disjunctively, it should have been phrased conjunctively." *McDonald,* 769 F.3d at 1212 n.3 (collecting cases).  The Tenth Circuit has thus made clear that foreclosure of employment opportunities is required, regardless of whether the defamatory statement occurs in the course of demotion or discharge.  This is because "[u]nder the Due Process Clause, public employees have a liberty interest in their reputations, but only in the context of their employment." *Coleman v. Ut. State Charter Sch. Bd.,* 673 F. App'x 822, 829 (10th Cir. 2016).[14]  A plaintiff can satisfy this element by alleging facts to support he has "been unable to find employment because of" the statement or media reports thereof.  *McDonald,* 769 F.3d at 1212, n.3.

The only instance in the Complaint where Mr. Tonjes alleges Wegener's statement foreclosed employment opportunities is in the now-dismissed seventh claim for defamation: "As

[14] A plaintiff could instead show a "termination based upon a publicized false charge of sufficient opprobrium that would make the plaintiff an unlikely candidate for employment by a future employer." *McDonald,* 769 F.3d at n.4.  *See also Coleman*, 673 F. App'x at 830–31.  But this theory appears limited to false statements charging dishonesty, immorality, serious felony, manifest racism, serious mental illness, or the like.  *Melton v. City of Okla. City,* 928 F.2d 920, 927 n.11 (10th Cir. 1991).  Mr. Tonjes does not allege or argue such facts.

a result of Defendant's [Wegener's] defamatory statements, Plaintiff Tonjes has suffered loss of reputation and ability to find re-employment." Complaint at ¶ 85. Assuming without deciding that the now-dismissed Paragraph 85 can still support the third claim for relief, it is conclusory. Because Mr. Tonjes does not allege facts to support that Wegener's statement foreclosed other employment opportunities, the court will dismiss the third claim. However, Mr. Tonjes may move to amend the complaint if he can assert facts to support this element. *See, e.g., Newton v. Unified Gov't of Wyandotte Cty.,* No. 17–cv–2043–JWL, 2017 WL 2591523, at *3 (D. Kan. June 15, 2017).

D. *Defendant Sheriff's Office Liability on 42 U.S.C. § 1983 Claims*

The Sheriff's Office argues that it cannot be liable under 42 U.S.C. § 1983 for a single personnel decision because this is insufficient to show a policy or custom of the Sheriff's Office as required under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694 (1978). The U.S. Supreme Court

> held in *Monell* … that a local government is liable under § 1983 for its policies that cause constitutional torts. These policies may be set by … those whose edicts or acts may fairly be said to represent official policy. A court's task is to identify those officials … who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional … violation at issue.

*McMillian v. Monroe Cty.,* 520 U.S. 781, 784–85 (1997) (internal citations and quotation marks omitted). *See also Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). "Cities cannot incur liability under § 1983 on a *respondeat superior* theory, but can be liable if a final policymaker takes unconstitutional action. ... Whether an individual is a final policymaker for purposes of § 1983 liability is a legal issue to be determined by the court based on state and local

law." *Vogt v. City of Hays,* 844 F.3d 1235, 1251 (10th Cir.), *cert. granted sub nom. City of Hays v. Vogt,* 138 S. Ct. 55 (2017) (internal citation and quotation marks omitted).

Defendants do not dispute that under Colorado law, Sheriff Wegener had final policymaking authority for the Sheriff's Office regarding discipline, demotion, and termination of deputies. Nor do they dispute that Sheriff Wegener personally executed the demotion of Plaintiff Tonjes and made the alleged statement to the news reporter. Defendants rely on inapposite cases, in which the plaintiff did not sue a municipal entity for the decision of its final policymaker, but rather attempted to argue a county board was responsible for the decisions of the sheriff, a city council was responsible for a police chief's actions, or a sheriff's office was responsible for an officer's actions by deliberate indifference in training or supervision. *See, e.g., Isenbart v. Bd. of Cty. Comm'rs,* No. 11–cv–03240–LTB–BNB, 2012 WL 4378269, *7 (D. Colo. 2012); *Bd. of Cty. Comm'rs v. Brown,* 520 U.S. 397, 406 (1997). *Brown* expressly distinguishes such cases from § 1983 claims that allege a personal, direct action of the final policymaker. But C.R.S. § 30–10–506 plainly makes the sheriff the final policymaker for the Sheriff's Office with respect to employment of deputies, and if the sheriff acted unconstitutionally in those duties, the Sheriff's Office can be held liable for his actions.

## CONCLUSION

Because Mr. Tonjes plausibly alleges denial of due process property interest, violation of First Amendment right to expressive association, breach of contract, and promissory estoppel, the court DENIES the motion to dismiss the first, second, fourth and fifth claims for relief.

The court GRANTS the motion to dismiss only as to the third claim for relief (First Amendment right of association). With respect to that claim, Plaintiff has leave to file a motion

to amend the Complaint within 30 days of this order if he can allege facts that Sheriff Wegener's statement to the reporter foreclosed other employment opportunities.

DATED: January 4, 2018.

BY THE COURT:

s/ _____
United States Magistrate Judge